# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-cr-007 (JMC)** |
| | : | |
| **MELVIN GRAYSON,** | : | |
| **CHARLES CUNNINGHAM, and** | : | |
| **TYRONE RAGLAND,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Defendants participated in a drug conspiracy spanning three years from January 2020 through January 2023 trafficking large quantities of PCP, fentanyl, cocaine and cocaine base (crack). All three defendants also possessed illegal firearms in furtherance of their drug trafficking. For the reasons stated herein, the Government respectfully requests that the Court sentence Defendants Cunningham and Ragland to 180 months (15 years) followed by 3 years of supervised release pursuant to their Rule 11(c)(1)(C) plea and sentence Defendant Grayson to a Guidelines sentence of 144 months (12 years) of imprisonment, followed by five years of supervised release.

## BACKGROUND

This case arises from a two-year investigation by the FBI, DEA, Metropolitan Police Department (MPD), Prince Georges County Police Department (PGPD) into narcotics trafficking and gun violence in the Washington, D.C. metropolitan area. As part of the investigation, law enforcement used Under Cover (UC) officers and Confidential Sources (CS). The FBI also utilized court authorized wiretaps on the cell phones of defendants Grayson and Kinard. In the course of the investigation, Grayson personally supplied UCs/CSs with approximately 150 grams of heroin, 900 grams of cocaine, 215 grams of PCP, and 200 grams of fentanyl (132 grams in pill form and

70 in powder). Further, all three co-conspirators Grayson, Ragland and Cunningham used firearms to protect their narcotics and the proceeds from their narcotics trafficking.

***Recoveries from the Residential Search Warrants***

On January 11, 2023, FBI agents executed a search warrant on defendants Grayson's Ragland's, and Cunningham's residences and other locations associated with them. From Defendant Grayson's home, law enforcement recovered approximately 100 grams of fentanyl pills, a digital scale, cutting agents, and about $7,000 in cash. In Defendant Grayson's storage unit, agents recovered 9.7 grams of heroin, 27 grams of cocaine, more cutting agents and drug paraphernalia, and four firearms. Photos of items recovered from Defendant Grayson are pictured below.






On January 11, 2023, FBI agents executed a search warrant at Defendant Cunningham's residence on 13th Street NE, Washington, D.C. where they recovered large quantities of narcotics: over 1,500 grams of PCP, over 50 grams of cocaine, over 50 grams of cocaine base, and over 270 grams of fentanyl. In the oven, next to a pouch of various drugs packaged for distribution, Defendant Cunningham kept a loaded Glock 31 handgun. During the course of the conspiracy, Defendant Cunningham stashed bulk quantities of PCP and fentanyl at his residence to provide to his coconspirators for redistribution. Below are photos of item recovered from Defendant Cunningham.



On January 11, 2023, FBI agents executed search warrants at two residences associated

with Defendant Ragland.  In Defendant Ragland's Eastern Ave SW apartment (where he

primarily resided), law enforcement recovered dozens of glass vials used for PCP distribution

along with multiple cell phones and a digital scale.  In Defendant Ragland's 6th Street SW

residence where he had unfettered access, agents found a firearm stashed between the mattress

and the bed's headboard, about 626 grams of PCP, 41 grams of cocaine, and $16,230 in cash. Though the 6th Street apartment was not leased in Ragland's name, on the intercepted calls, Defendant Ragland discussed going to the 6th Street apartment and he was surveilled accessing the apartment on his own by punching in the key code in late November 2022. Moreover, when the lessee was evicted in February 2023, agents found Ragland's prescription medication bottles, checks, and mail matter on the very bed where he stashed the gun. Photos of items recovered from Defendant Ragland are pictured below.





***Wiretap Calls and Conspiracy***

Intercepted calls through the court-authorized wiretap revealed the existence of a conspiracy between Defendants Grayson, Ragland, and Cunningham. For example, on August 8,

2022, Grayson conspired with Cunningham, and Cunningham's brother-in-law, James Kinard to pick up PCP from Cunningham's house. Kinard and Grayson were seen entering Cunningham's residence that same day. The next day, Grayson tells Ragland that he picked up the PCP from Cunningham's residence and that he picked up Ragland's portion as well, which Ragland then redistributed. In later calls, Ragland and Grayson complain that the PCP they got from Cunningham contained excessive starter fluid because Ragland's customer almost burnt her eyebrows when she lit her cigarette dipped in the PCP. The calls also showed that Grayson had an ongoing agreement to get PCP from both Cunningham (through Kinard) and Ragland.

## PROCEDURAL HISTORY

On March 11, 2025, a second superseding indictment was filed charging Defendants Grayson, Ragland, Kinard, Cunningham and Watts in a conspiracy to distribute cocaine, 40 grams of fentanyl and one kilogram of PCP (Count One). In Counts Two and Three, Defendant Ragland was charged with possession with intent to distribute PCP and cocaine for the drugs that were recovered during the search warrant on January 11, 2023. In Counts Four and Five, Ragland was charged with unlawful possession of a firearm by a felon and possessing a firearm in furtherance of drug trafficking. Ragland's felon in possession charge also carried a sentence enhancement under the Armed Career Criminal Act. In Counts Six, Seven, Eight and Nine, Defendant Cunningham was charged with possession with intent to distribute fentanyl, cocaine base, cocaine, and PCP for the drugs that were recovered during the search warrant on January 11, 2023. In Counts Ten and Eleven, Cunningham was charged with unlawful possession of a firearm by a felon and possessing a firearm in furtherance of drug trafficking. Cunningham's felon in possession charge carried a sentencing enhancement under the Armed Career Criminal Act.

On May 7, 2025, Defendants Grayson, Cunningham, and Ragland pleaded guilty. Grayson pleaded guilty to the second superseding indictment charging him in Count One (drug conspiracy) without a plea agreement. Cunningham pleaded guilty pursuant to a Rule 11(c)(1)(C) plea to Count Eleven (unlawful possession of a firearm) and agreed to a sentence of 180 months. Ragland pleaded guilty pursuant to a Rule 11(c)(1)(C) plea to Count One (drug conspiracy) and agreed to a sentence of 180 months.

## SENTENCING GUIDELINES

The Government concurs with the Draft Pre-Sentence Reports [ECF No. 324, 325, and 326] ("PSR") calculation of each Defendant's offense levels and Guidelines calculations. For Defendant Grayson, the Government concurs that the base offense level is 32 based on converted drug weight, with a two-point enhancement for a firearm, and that the Defendant accepted responsibility for a two-point reduction to his offense level. ECF 325 at ¶¶ 89-98. The Government also concurs that Grayson is not eligible for a zero-point offender adjustment. ECF 325 at ¶ 97. Thus, based upon the draft PSR released on July 2, 2025, the resultant total offense level of 32, along with a Criminal History Category of I, results in a corresponding range of imprisonment under the Guidelines of 121 months to 151 months.

For Defendant Cunningham, the Government concurs that the base offense level is 24, with a four-point enhancement for using the firearm in connection with another felony offense; however, under USSG § 4B1.4, Cunningham's enhanced offense level as a career criminal is 34, and with a two-point reduction for acceptance of responsibility, which brings his offense level to 32. ECF 324 at ¶¶ 65-74. The Government also concurs that Cunningham is not eligible for a zero-point offender adjustment. ECF 324 at ¶ 73. Thus, based upon the draft PSR released on July 1, 2025, the resultant total offense level of 32, along with a Criminal History Category of VI,

results in a corresponding range of imprisonment under the Guidelines of 210 months to 262 months.

For Defendant Ragland, the Government concurs that the base offense level is 30 based on converted drug weight, with a two-point enhancement for a firearm; however, under USSG § 4B1.4, Ragland's enhanced offense level as a career criminal is 37, and with a two-point reduction for acceptance of responsibility, brings his offense level to 35. ECF 326 at ¶¶ 75-84.  The Government also concurs that Ragland is not eligible for a zero-point offender adjustment. ECF 326 at ¶ 83.  Thus, based upon the draft PSR released on July 3, 2025, the resultant total offense level of 35, along with a Criminal History Category of VI, results in a corresponding range of imprisonment under the Guidelines of 292 months to 365 months.

### Response to Defendant Ragland's Objection to the PSR

Ragland contends that his use of the word "heat" or "heater" was ambiguous and that he could have also meant cocaine instead of firearm.  However, given the context of the conversation and how Ragland unambiguously expressed his concern over his dispute with Mike stating "I'm still fucked up" and "I had to real life call my ugh, mom man to come get me to get to my car," that it strains credulity that Ragland was carrying around cocaine to protect himself from a perceived threat by "Mike".  Given the context of the conversation, excerpted below, the Court can find by a preponderance of the evidence that Ragland was riding around with a gun to protect himself from "Mike" who believed Ragland owed him money.

Ragland:        But, but, I just called him, and I said, reason I'm so messed up, I'm still fucked up because n**ga you realized and said I didn't give you the money, come down the street, I ain't tell you all that, talking about I ain't even call you back with the bullshit. He talking bout man, he call me back talking about man come outside man, I'm going to have to see him about that shit man, come down the street, get away from the building and all that. I had to real life call my ugh, mom man to come get me to get to my car, then go

over to Veen house, you see what I'm saying, to get my shit. He
got me riding around like this, and this shit, you see what I'm
saying.

Moreover, in relaying this story to Grayson, Grayson understood exactly what Ragland
meant by the term heater—that he was a carrying a gun for protection.  Grayson later recounts the
story to Watts, and describes how Ragland had put the "dog" in the house because the "puppy
don't have no papers," making it clear that Grayson understood that "heater" was in reference to a
gun, and not cocaine.  Yet more telling, immediately after the recorded call in which Ragland states
"Mike" had him riding around with a heater, MPD officers pulled him over.  As Ragland then
recounts his encounter with MPD to Grayson, Ragland says, "Why they gonna tell me they got a
call that I'm, I gotta handgun?" and Grayson responds "Damn, who the fuck knew that?"
confirming that they both understood Ragland in fact had a gun.  Ragland's responded "that's what
they tell" and went on to explain how MPD asked him and his son to step out.  Ragland never
expressed confusion as to why MPD would ask him about a handgun, nor did he tell Grayson that
a search of his car might have yielded discovery of cocaine.  In fact, Ragland was explicit that he
dropped off the gun at his house before taking his son to get a haircut (and getting pulled over),
stating "me and my son just now left my house, setting that joint down." Ragland's own words
and explanation for why he possessed a gun and how he dropped it off at his house before MPD
pulled him over belies his contention now that he never possessed a firearm.

Regarding the DNA conclusions, the Government maintains that footnote 5, ECF 326 ¶ 59
is accurate.  The Government does not dispute that independent testing at Bode Lab produced a
different result but provides further explanation for the qualitative difference in the two labs'
results.  Even if the Court were to ignore both parties' DNA results, the Government submits that
by a preponderance of the evidence, the Court should find that Ragland possessed a firearm.

Ragland stated in the wiretap calls that he rode around with a gun because Mike thought Ragland shorted him $3000 and admitted to Grayson that he had just stashed the gun at his house before he was pulled over by police. Ragland later moved his gun from his residence to another apartment on 6th Street that he had access to dissociate himself from the gun, following the advice of Grayson to "clean up" and utilize "that little spot down the street". It is important to note that when Ragland moved his gun from his Eastern Ave residence to the residence on 6th Street where the gun was ultimately recovered, he had already been pulled over by police and suspected of possessing a firearm. At this point, Ragland had the notice, motive and opportunity to clean the gun, which can explain the low quantity of DNA derived from the gun swabs even in the government's initial testing. Finally, while the residence may have been leased by a woman, the bedroom that Ragland hid the gun in contained mail matter and prescription medication bottles in his name.

It is illogical that Ragland was talking about cocaine as he now alleges. It makes no sense that one would carry around cocaine for protection following a dispute over money with another drug dealer. Grayson understood "heater" to mean a firearm and common-sense dictates that when Grayson said to Watts that Ragland put the puppy in the house because he had no papers, he did not mean he stored his cocaine in the house because it was unregistered (i.e. no papers). If Ragland only ever possessed cocaine, and not a firearm, he would have expressed confusion over why MPD would *think* he had a firearm; instead, he only questioned how MPD *found out* he had a gun, implying that MPD's knowledge was true rather than questioning why MPD would mistakenly think that in the first place.

An excerpt of the conversations demonstrating Ragland's possession of a firearm is below:

**RAGLAND:** Now, why I'm just leaving out of um Naja house, getting my son hair cut right…

**GRAYSON:** Hmmm hmm.

**RAGLAND:** Soon as we get on Minnesota Avenue, we pass, pass, ugh, get like right by the park. Why them peoples come up behind me real, real fast. I'm thinking, I'm thinking they going towards, **they pull me over. Why they gonna tell me they got a call that I'm, I gotta handgun?**

**GRAYSON:** **Damn, who the fuck knew that?**

**RAGLAND:** Hmm, that's what they tell. Snatch me and my son out. Took my name, took all our names, I told them go ahead and search the car. Went through the car, you they, real live. And say they got a call. So I say, what it is, what I say. It all seem fake, cause I was telling , so listen (background voice "he aint have the body camera) ain't have the body camera (background voice "he ain't have no back up or nothing" UI [UNINTELLIGBLE]). Yeah, yeah, my son say, "Do you have the body camera on?" So he turned the body camera on, so, but then at the firetruck coming down the street, he talking about oh, they probably going to the call. I say, "What call?" He said the call, it's the call we talking about, that I'm, I'm pulling you over on. I said well somebody got shot or something? So, something he said, long story short, I'm like, in real life, like I said, I'm saying, I don't know. He said yeah, he got to call with my, my, this, this Benz, the tag number, so I said the letters, I said T-F, T…T-V-H? he said hmm, I'm not sure about that but the, the numbers, yeah the numbers, the numbers fit. And I said so when you get this call, cause we just . . . I had to call Naja on the phone and everything, to get Naja apartment number.

**GRAYSON:** Hmm. That's crazy.

**RAGLAND:** And, and you know what? And you know what I just thought about? That n_____ asked me then how long I've been living at that address.

**GRAYSON:** UI [UNINTELLIGIBLE]

**RAGLAND:** **They can't get no search warrant like that can they?**

**GRAYSON:** You talking about UI [UNINTELLIGIBLE]?

**RAGLAND:** Huh?

**GRAYSON:** Nah, they can't but, shit, but they do strange shit, man.

**RAGLAND:** Yeah, that was some, that that, that's that, from that thought alone. It just seem strange that they just had my tag number just now, saying they could've been making up the story. But the whole, the way they just had us outside for like 15 minutes. That shit was just crazy.

**GRAYSON:** Yeah.

**RAGLAND:** No bullshit.  Real life.  Went through this motherfucker heavy. Just them two though. They ain't . . . another joint pulled up, but they never got out.  But they, just these two.  Then I said, "Well, dang.  Let me ask you a question." After it was all the formalities is over and they let me go, I said, "What squad you on?"  He talking about the violent, the violent crime prevention squad. And I said, "Well, look remember that name cause I ain't, I ain't , I ain't, um, I ain't one of them violent . . . I ain't with that.   I ain't got one them.  I ain't a persons of interest. Just remember that name. Cause they realize, just yeah.  **But it just crazy after the incident and I just left to set the joint down you see what I'm saying?**

**GRAYSON:** So you, so so, so, so you, so you just leaving Naja house?

**RAGLAND:** **I'm leaving Naja house, but me and my son just now left my house, setting that joint down.  You see what I'm saying?**  Then went to Naja house.

**GRAYSON:** Hmmm hmmm. **So, so before that, where you was at?**

**RAGLAND:** **I was riding, yeah.**

**GRAYSON:** So, do the, man that's crazy.  Let me see…

**RAGLAND:** Yeah, that's crazy as shit, man.

**GRAYSON:** **So do the joker know you was riding around like that?**

**RAGLAND:** **Yeah, probably hell yeah, hmmm hmm, probably, hmmm hmmm.**

**GRAYSON:** Shit, that's crazy.  I don't know, nah.  I'm just thinking.  I'm thinking, you see cause . . .

**RAGLAND:** That's why I called you.  Cause this some type of shit you would say.

**GRAYSON:** Nah…Hey…

**RAGLAND:** **It's just kind of crazy that they pulled over me in my car and I ain't never pulled over since I had this car.  Never.  And the way they ran down on me just now, them two motherfuckers.  Like they really knew something.  Like, like, I really real life had a gun.**

**GRAYSON:** **Nah, I'm thinking like damn, I wonder if the n___ was that mad he put the people on you.  Like fuck it.  I aint gonna get my money.  I'm gonna put the people on him. Shit, I don't know man.  It's some wild shit though.**

**RAGLAND:** **I ain't riding dirty anyway so it don't matter.  I ain't…it's just the inconvenience. I'm about to go on Eastern Avenue now.**

**GRAYSON:** So, so what, what, so you said, so you said, **could they get a search warrant? What address you got?**

**RAGLAND:** The Central Ave, **I mean Eastern Avenue.**

**GRAYSON:** Oh, yeah. **Hey, just clean that motherfucker up.** Better be safe than sorry.

**RAGLAND:** Yeah.

**GRAYSON:** Yeah I, yeah I, yeah. **You still got that, you still got that little spot down the street from there, right?**

**RAGLAND:** Yeah, hmm hmm.

**GRAYSON:** Yeah, you might well just do that. Yeah, just take your time man, take your time. J**ust go ahead and clean up, take your time.**

**RAGLAND:** Ain't nothing right there anyway.

**GRAYSON:** Hey, I wouldn't give, hey, I'm talking about anything.

**RAGLAND:** You right, ok.

**GRAYSON:** I'm talking 'bout anything that they could say. You know ugh, a bottle, a sandwich bag, all that shit.

**RAGLAND:** Got you, all right. I got you.

Regarding Ragland's objection to ECF 326 ¶ 105, the two-points is correctly applied as the sentencing date (June 2013) was within 10 years of the commencement of the instant offense (January 2020).

## LEGAL STANDARDS

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors

include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines

in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

For Defendant Grayson, a sentence of 144 months of incarceration followed by 5 years of supervised release in this case is appropriate given the years-long conspiracy to traffic large quantities of PCP and fentanyl, while possessing firearms.  For Defendants Ragland and Cunningham, a sentence of 180 months pursuant to the Rule 11(c)(1)(C) plea is appropriate to account for the large-scale drug trafficking and their career offender status.

### 1.    The Nature, Circumstances, and Seriousness of the Offense

PCP is Schedule II dangerous drug that its use often results in compulsive behavior, causing users to "become violent or suicidal".[1]  PCP's effects include delusions, hallucinations, paranoia, problems thinking, a sense of distance from one's environment, and anxiety, which in high doses can cause a person to act violently.[2]  PCP continues to be prevalent in the Washington, D.C. area

---

[1] PCP Fast Facts, https://www.justice.gov/archive/ndic/pubs4/4440/index.htm
[2] See
https://www.ncbi.nlm.nih.gov/books/NBK424847/table/appd.t13/#:~:text=Lifetime%3A%206.3%20million%20persons%20(2.4,PCP%20in%20the%20past%20year.

thanks to individuals who peddle PCP into the community like Defendants Grayson, Cunningham, and Ragland.

The Defendants also participated in a conspiracy to distribute fentanyl. Fentanyl is also a Schedule II dangerous drug that is responsible for the deaths of many Americans in this country. As the Court knows, fentanyl is an extremely lethal drug. Two milligrams of fentanyl can be fatal. *See United States v. Glasgow*, 2021 WL 2403136 at *7 (D.D.C.) (Lamberth, J.). According to the DEA, "[f]entanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage."[3] According to the Centers for Disease Control, D.C. ranks number one in the nation for drug overdose deaths, based on the age-adjusted rate of deaths per 100,000 persons in 2023[4]. For specifically illegally-made fentanyl deaths in 2023, D.C. ranks first in the nation.[5]

Here, the Defendants worked together to supply each other with PCP and fentanyl for redistribution, ensuring they had a constant supply of PCP and fentanyl to inject into the community. Defendants facilitated large-scale PCP and fentanyl transactions, while each defendant possessed at least one firearm. This too is an inherently dangerous act that placed the community at risk. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v.*

---

[3] https://www.dea.gov/resources/facts-about-fentanyl

[4] https://www.cdc.gov/overdose-prevention/data-research/facts-stats/sudors-dashboard-fatal-overdose-data.html?CDC_AAref_Val=https://www.cdc.gov/drugoverdose/fatal/dashboard/index.html

[5] *Id.*

*Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence"). Accordingly, the Government views this as a serious offense that is deserving of a lengthy sentence even without considering the mandatory minimum sentence of ten years for Grayson and the 11(c)(1)(C) plea of 15 years for Ragland and Cunningham.

### 2. The Defendants' History and Characteristics

Defendant Grayson is 52 years old. Despite a reported abusive and absentee father, the defendant graduated high school and as recently as 2023 had a 3.9 GPA pursuing an Information Technology Bachelor of Science degree. The Defendant's multiple business ventures also demonstrate a means and ability to earn money legitimately, but instead he chose to traffic illegal drugs as an easier and more lucrative way of living. Despite having only one drug conviction from when he was 19 years old, his arrest history shows repeated contacts with law enforcement for drug possession with intent to distribute. Despite the past conviction and arrests, the Defendant returned to drug trafficking and on a much larger scale.

Defendant Cunningham is 59 years old. Prior to his incarceration, he supported himself by selling drugs, gambling, and holding various odd jobs. As a career offender, he has multiple drug convictions spanning decades. In 2008, at the age of 41, he pleaded guilty in D.C. District Court to unlawful distribution of five grams or more of cocaine and received a 108 month sentence, which was later reduced to 70 months. ECF 324 ¶ 108. His supervised release was revoked, and he received an additional 10 months. In the instant case, the defendant pleaded guilty pursuant to a Rule 11(c)(1)(C) plea of 15 years. Had he gone to trial and been convicted of the gun possession in violation of 18 U.S.C. Section 922(g) and 924(e) with the Armed Career Criminal Act enhancement and the 18 U.S.C. Section 924(c), he would have faced a mandatory 20 year sentence. Accordingly, a 15 year sentence is warranted balancing his criminal history and his acceptance of

responsibility in the instant case.

Defendant Ragland is 57 years old.  Ragland is also a career offender with numerous qualifying drugs offenses under 18 U.S.C. Section 924(e)(2), and as such, had he gone to trial and been convicted of the gun possession in violation of 18 U.S.C. Section 922(g) and 924(e) with the Armed Career Criminal Act enhancement and the 18 U.S.C. Section 924(c), he would have faced a mandatory 20 year sentence.  Even taking into consideration the less conclusive DNA results for the gun, the drug conspiracy charge (Count One) that Ragland pleaded guilty to carries a mandatory minimum of 10 years.  The Defendant's longest sentence he served appears to be a 1996 conviction for possession with intent to distribute cocaine in D.C. Superior Court where he received 10 to 30 years of imprisonment and ultimately served seven years.  ECF 326 ¶ 101.  Given the Defendant's criminal history, his Guidelines range is 292 to 365 months, far above the 180 months the parties have agreed to.

### 3.     The Need to Promote Respect for the Law and Deterrence

For all three Defendants, a significant sentence is necessary to deter them from further criminal conduct and to protect the community.  Prior sentences for the same type of conduct has failed to deter these defendants from reoffending, thus requiring lengthier sentences.  *See, e. g., Qualis v. United States,* 373 F. Supp. 2d 873, 877 (E.D. Wisc. 2005 ) ("It is appropriate for a court, when considering the type of sentence necessary to protect the public and to deter future misconduct, to note the length of any previous sentences imposed."); *see also United States v. Molina,* 952 F.2d 514, 519 (D.C. Cir. 1992) (noting that repeated commission of the same offense may warrant a higher sentence than previously given to the same defendant for purposes of deterrence); *see also United States v. Guzman-Najera*, 440 Fed. Appx. 391 (5th Cir. 2011) (affirming sentence of 57 months for illegal reentry when defendant had previously served two 30

month sentences for the same offense).  In each case, the government's requested sentence is supported by their previous conduct and/or sentences.  Defendant Cunningham's longest sentence for similar conduct was 70 months, and the 180 months sentence here would be a little more than double.  Similarly, Defendant Ragland's longest sentence for similar conduct was 7 years, and the 15 year sentence here would be a little more than double.

### 4.    The Need to Avoid Sentencing Disparities

A sentence within the Guidelines will generally avoid unwanted sentencing disparities among defendants who have committed similar crimes.  Indeed, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).

In this case, the Government's recommended sentence for Grayson is within the Guidelines range of 121 to 151 months.  For months, Grayson directly supplied UCs/CIs fentanyl, heroin, cocaine, and PCP.  He conspired with Defendant Watts to obtain about two gallons of PCP that was shipped from California to D.C. for redistribution. During the conspiracy period, Grayson maintained firearms that were recovered from his storage unit next to digital scales, cutting agents, and other drug trafficking paraphernalia.  While Grayson's criminal history is less severe than that of Cunningham and Ragland, his conduct in this case is commensurate with his coconspirators who are receiving 180-month sentences.  Grayson also pleaded to the indictment without a plea agreement, unlike Cunningham and Ragland who without the plea agreements, would have faced 20 year mandatory minimum sentences for their conduct if convicted at trial.  Considering the sentences Cunningham and Ragland would have received if convicted without a plea agreement and their enhanced criminal history, the government's request for a 144 month sentence for

Grayson is fair by comparison.

For Defendant Cunningham and Ragland, the parties' requested sentence of 180 months pursuant to the Rule 11(c)(1)(C) plea is below the Guidelines for both defendants, and the variance is justified given their age and their acceptance of responsibility through the plea agreement conferring certain benefits to the government.  On the other hand, 180 months is not too severe given their career offender status and the 20 year minimum they would have served if convicted at trial.    As noted in their PSRs, for both Cunningham and Ragland, the median length of imprisonment for a similarly situated defendant is 180 months.

**4.    Other Factors**

Cunningham and Ragland have repeatedly been convicted of drug trafficking offenses, and a lengthy sentence is warranted to protect society.  While Grayson's convictions are limited, his arrest history and conduct in the course of this investigation indicate a history of drug trafficking and accordingly, a higher Guidelines sentence is similarly warranted to protect society.

## CONCLUSION

For the foregoing reasons, the Government recommends that the Court sentence Defendant Grayson to 144 months followed by 5 years of supervised release; sentence Defendant Cunningham to 180 months followed by 3 years of supervised release pursuant to the plea agreement; and sentence Defendant Ragland to 180 months followed by 3 years of supervised release pursuant to the plea agreement.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:  */s/ Iris Y. McCranie*
IRIS Y. MCCRANIE
Assistant United States Attorney
NY Bar No. 5011234
601 D Street, NW
Washington, DC 20530
(202) 252-7828
Iris.mccranie@usdoj.gov